**In Re: Condemnation by the BOROUGH OF BLAKELY, Lackawanna County, Pennsylvania.**

**John R. Williams, Appellant**

v.

**Borough of Blakely.**

Commonwealth Court of Pennsylvania.

Argued June 6, 2011.

Decided July 18, 2011.

---

William P. Bresnahan, Pittsburgh, for appellant.

Edwin A. Abrahamsen, Scranton, for appellee.

BEFORE: SIMPSON, Judge, and McCULLOUGH, Judge (P), and KELLEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this eminent domain case, John R. Williams (Owner) appeals from an order of the Court of Common Pleas of Lackawanna County (trial court)[1] that sustained Blakely Borough's (Borough) preliminary objections to Owner's petition for appointment of a board of viewers (petition for viewers) alleging the Borough effectuated a de facto taking of a portion of his property by installing a PVC drainage pipe that cuts off vehicular access to an adjacent road. Owner contends that the trial court erred in dismissing his petition as premature pursuant to Borough of Centralia v. Commonwealth, 658 A.2d 840 (Pa.Cmwlth. 1995) and that he alleged sufficient facts to establish a de facto taking under the 1964 Eminent Domain Code (1964 Code).[2] For the reasons that follow, we affirm.

## I. Background

### A. Factual History

The record in the present case consists of deposition testimony and documentary evidence. Owner testified on his own behalf. John J. Castellani (Surveyor), a surveyor and adviser for the Borough since the early 1970s, testified for the Borough. The parties also jointly submitted a copy of Owner's deed to a former railroad bed (railroad bed or subject property), and two survey maps of the subject property. See Joint Exs. 1, 2, 6. Owner also submitted three photographs of the subject property. See Pl.'s Exs. 3, 4, 5.

In 1966, Owner purchased property fronting on Everson Street and abutting the railroad bed and Virginia Avenue. In 1986, Owner purchased the subject property. There are no written easements over the subject property.

After his purchase of the subject property, Owner's property was originally bounded by streets on two sides. However, after his purchase of the railroad bed, Owner's property is now bounded by Gino Merli Drive to the north, Everson Street to the east, and Virginia Avenue to the west. There are two neighboring properties to the south. Since his 1966 purchase

---

1. Visiting Senior Judge Harold A. Thomson, Court of Common Pleas of Pike County, presided.

2. See Act of June 22, 1964, Special Sess., P.L. 84, as amended, formerly 26 P.S. §§ 1–101–1–903, repealed by Section 5 of the Act of May 4, 2006, P.L. 112. The current Eminent Domain Code, 26 Pa.C.S. §§ 101–1106, became effective September, 1, 2006. It applies to all condemnations effected on or after that date. See 26 Pa.C.S. § 101 (Historical and Statutory Notes). Here, Owner alleged in his petition for viewers that the taking occurred in or about the summer of 1989. Pet. for Viewers at ¶ 11.

of the larger parcel fronting on Everson Street, it has been Owner's intention to build homes and townhomes on both Everson Street and Virginia Avenue. In 2001 or 2002, Owner constructed an apartment building on Everson Street.

Surveyor does a lot of work on the Borough's water problems, sanitary problems, sewer lines and roadways. He surveyed the subject property in the early 1970s and is familiar with the changes to it. The Everson Street side of Owner's property is higher than the subject property. More specifically, there is about a 100–foot drop from Everson Street to the subject property.

At the time Owner purchased the abutting property in 1966, the subject property was still in use by the railroad. The railroad tracks and ties were removed in the late 1960s or early 1970s. Fine coal was then surface mined from the bed to a depth of 8–10 feet. As a result of the removal of the tracks and surface mining, the subject property flattened out into a ravine. This led to substantial flooding problems. Storm water collected in the ravine and flooded lower lying properties.

Over time, a ditch formed along the subject property. Surveyor testified the Borough maintained the ditch, which is adjacent to Virginia Avenue, since the 1970s. It periodically cleaned out or re-dug the ditch, which became a means for controlling storm water runoff.

In the early 1980s, the Borough placed a plastic drainage pipe in the ditch and covered it with dirt. The Borough also continued to clean out and maintain the ditch. As a result of flooding and other problems, the pipe needed to be replaced on several occasions. In the late 1980s or early 1990s, the Borough received federal grant money for storm water cleanup, and it replaced the pipe. The Borough also put in a retention basin at this time. In the mid–1990s, the Borough replaced the pipe a second time.

Owner testified that in the early to mid–1990s, the Borough entered the subject property without permission to place the new underground pipe in the railroad bed/ditch. The new pipe was approximately 1200 feet in length and at this time extended over the entire length of the subject property. The Borough covered the plastic pipe with 12 feet of fill. However, it could not support vehicular traffic. To support vehicular traffic, the pipe would need to be replaced by a reinforced concrete pipe.

Also in the mid–1990s, Owner purchased over 20 truckloads of fill and deposited it along Virginia Avenue with the purpose of placing it in the ditch on the subject property to gain access to Virginia Avenue. The Borough, however, confiscated the fill and put it in the drainage ditch on adjacent properties. Owner also recalled that Harry McCusker (Borough Manager) told him the Borough owned the ditch and Owner could not fill it in.

Further, in 2006–2007, the Borough began constructing a 180–foot fence on the Property with "No Trespassing" and "No Dumping" signs facing toward Owner. Surveyor agreed the fence served no valid purpose. After a month, the Borough removed the fence posts.

Also, in 2005–2006, Owner made a presentation to Borough Council about developing residential lots on Virginia Avenue. Owner became aware he would need a dimensional variance for three lots. Owner recalled he told the Borough, "I don't want you to compensate me for the pipe that's there, but in compensation I would like you to put in the three uprights to come up to the height of the land between Everson and Virginia, and backfill that in, and give me the variance for these other

three lots...." Notes of Testimony (N.T.), 02/25/09, at 54.

## B. Procedural History

### 1. Pleadings

In May 2008, Owner filed a petition for viewers alleging a *de facto* taking. He alleged the Borough, in constructing storm water drainage facilities adjacent to Virginia Avenue, effectuated a *de facto* taking of the subject property.

Owner alleged as follows. In the summer of 1989, the Borough installed a drainage pipe on the subject property that cut off access to Virginia Avenue, which resulted in a diminution in the value and use of the property. Pet. for Viewers at ¶ 11(a). The Borough also refused to fill in the open ditch containing the pipe, which cut off access to the property by way of Virginia Avenue. *Id.* at ¶ 11(b). In the mid–1990s, the Borough again entered the subject property, removed stockpiled fill, and deposited it in the ditch on adjacent properties. *Id.* at ¶ 11(d). Also, in or about 2006, the Borough began installing a metal fence adjacent to the ditch and placed "No Dumping" signs on it facing the subject property. *Id.* at ¶ 11(e). These actions effectuated a *de facto* taking of the subject property.

In response, the Borough filed preliminary objections specifically denying Owner's allegations. *See* Prelim. Objections at ¶ 7. The Borough countered that no taking occurred because it has an easement for the drainage ditch. *Id.* The Borough further alleged Owner's *de facto* claim, which accrued before the current Eminent Domain Code was enacted in 2006, is barred by the 21–year statute of limitations. *Id.*

Thereafter, the parties filed their respective briefs and submitted the case to the trial court on the record. In October 2010, the trial court issued an order sustaining the Borough's objections and dismissing Owner's petition for viewers.

### 2. Trial Court Order/*Centralia*

In its order, the trial court stated it denied and dismissed Owner's petition pursuant to this Court's holding in *Centralia.* The facts in *Centralia* are unique. There, the Commonwealth, its Department of Community Affairs, and the Columbia County Redevelopment Authority (redevelopment authority), initiated a program to relocate the borough's residents due to health and safety threats from the long-burning fire in the borough's underground mines. A small number of residents declined to relocate. The redevelopment authority notified these residents that it would condemn their surface properties under the 1964 Eminent Domain Code. However, the borough owned the subsurface areas of the residents' properties, which included mineral and coal reserves.

In 1992, the borough filed a petition for viewers alleging a *de facto* taking of the subsurface mineral and coal reserves. The trial court dismissed the borough's petition for viewers on the basis that the borough never acquired the right to mine and thus would not be substantially deprived of its property by the redevelopment authority's acquisition of the surface properties.

On appeal, we disagreed with the trial court's conclusion that the borough suffered no loss because it never acquired actual mining rights. However, we affirmed on different grounds. We determined the ripeness doctrine applied because no actual controversy existed. More specifically, the borough's petition failed to aver existing facts that could establish a *de facto* taking. It merely alleged the respondents *will* effect a *de facto* taking once they complete the acquisition and relocation program. The borough hypothetically

averred that removal of all borough residents will result in removal of borough government. In turn, removal of borough government will result in the borough being unable to use and enjoy its property and, ultimately, the loss of the coal reserves to the Commonwealth.

This Court further observed that the borough failed to aver facts "which are certain to occur and will support this conjectural allegation." *Centralia*, 658 A.2d at 842. We therefore reasoned (with emphasis added):

> The averments in [the borough's] petition are hypothetical. No party has presently restricted [the borough's] right to mine. There is no allegation that [the borough] cannot now mine the subsurface areas it owns because surface areas will be taken and residents will be relocated. Nor can it be established at this point that [the borough] will cease to exist or will definitely be prevented from mining in the future. In sum, there has been no de facto taking of the borough's right to use and enjoy the subsurface. It could be said that, in a sense, there may eventually be a de facto taking of the borough itself, but not the rights to the subsurface. Apart from the plain circumstance that governmental activity has not affected the immediate use of the property, any threatened loss of the property is conjectural.

*Id.* at 843. Accordingly, in light of the hypothetical nature of the borough's claims, we held the borough's petition "at this point certainly does not sufficiently state a cause of action for a *de facto* taking." *Id.*

Here, the trial court dismissed Owner's petition pursuant to our holding in *Centralia.* Owner appeals.[3]

## II. Issues

Owner contends the trial court erred or abused its discretion by relying on *Centralia,* which is distinguishable on factual and legal grounds. Owner also contends the trial court erred or abused its discretion in dismissing his petition for viewers where the Borough's actions so interfered with the use of his property as to constitute a *de facto* taking.

## III. Discussion

### A. Owner's Arguments

Owner contends the trial court's reliance on *Centralia* is misplaced because it is factually distinguishable. In other words, he argues he averred sufficient facts to establish a *de facto* taking occurred.

▐▐▐ In order to prove a *de facto* taking, the property owner must establish exceptional circumstances that substantially deprived him of the beneficial use and enjoyment of his property. *Visco v. Dep't of Transp.*, 92 Pa.Cmwlth. 102, 498 A.2d 984 (1985). This deprivation must be caused by the actions of an entity with eminent domain powers. *Id.* Also, the damages sustained must be an immediate, necessary and unavoidable consequence of the exercise on the entity's eminent domain powers. *Id.* A *de facto* taking is not a physical seizure of property; rather, it is an interference with one of the rights of ownership that substantially deprives the owner of the beneficial use of his property. *Id.* The beneficial use of the property includes not only its present use, but all

---

**3.** Where a trial court has either sustained or overruled preliminary objections in an eminent domain proceeding, our review is limited to determining whether the trial court committed an error of law or abused its discretion. *Lang v. Dep't of Transp.*, 13 A.3d 1043 (Pa.Cmwlth.2011).

potential uses, including its highest and best use. *Id.*

Owner asserts that unlike in *Centralia* the facts raised in his petition are concrete, not hypothetical. He delineated actual activities and events that resulted in such exceptional circumstances as to substantially interfere with the beneficial use of the Property.

First, the installation of the drainage pipe on the subject property cut off vehicular access to it by way of Virginia Avenue. Surveyor testified he registered his opinion that the plastic pipe with 12 feet of fill on it could not support concrete boxes and vehicular traffic. *See* N.T. at 82–83. To support that load, reinforced concrete pipe would be needed. *Id.* This loss of access to Virginia Avenue diminishes the value and use of the subject property and is real, not hypothetical.

Second, the Borough confiscated over 20 truckloads of fill on the subject property that Owner purchased. The Borough then deposited it in the ditch on adjacent properties.

Third, the Borough began construction of a fence on the Property along Virginia Avenue. It also placed "No Trespassing" and "No Dumping" signs on the fence facing the subject property.

These events, Owner asserts, already occurred and effectuated a *de facto* taking of the subject property. Therefore, unlike the borough in *Centralia,* he presented a matter ripe for judicial review and determination. Thus, the trial court erred or abused its discretion in dismissing Owner's petition for viewers based on the holding in *Centralia.*

### B.  Borough's Arguments

The Borough counters the trial court properly relied on *Centralia* in dismissing Owner's petition for viewers. It asserts the trial court's reliance on the holding in *Centralia* shows the trial court considered the facts as established by the testimony and determined Owner failed to state a cause of action for a *de facto* taking. The Borough argues a clear analysis of *de facto* taking law, applied to the facts here, indicates the trial court neither erred nor abused its discretion in dismissing Owner's petition.

In support, the Borough asserts Owner had the Virginia Avenue lots surveyed, but he never drew up any plans for the houses he intended to build on them. *See* N.T. at 50. Further, Owner never presented any type of formal plan to the Borough Planning Commission or formally requested a hearing before it. *Id.* at 51–52.

Moreover, the Borough never prohibited Owner from developing the subject property in the manner he intends. Rather, the Borough simply indicated to Owner that his plans must factor in storm water runoff and protection for lower lying neighboring properties. Storm water runoff is currently collected and maintained by the drainage ditch and pipe. As long as Owner maintains this protection, the Borough will not prohibit Owner from appropriate development projects.[4]

### C.  Analysis

■■■ A *de facto* taking under either the 1964 or current Eminent Domain Code occurs when an entity with eminent domain powers substantially deprives prop-

---

4.  The Borough also contends: no taking occurred because it obtained a drainage easement over the subject property by various means; Owner's *de facto* claim under the 1964 Eminent Code is barred by the 21–year limitations period applicable to it; and, Owner's tort claims for the confiscated fill and installation of fence posts are barred by the two-year limitations period in 42 Pa.C.S. §§ 5524(4) and (7).

erty owners of the use and enjoyment of their property. *Lehigh–Northampton Airport Auth. v. WBF Assocs., L.P. (Lehigh Airport Auth. I)*, 728 A.2d 981 (Pa. Cmwlth.), *appeal denied*, 560 Pa. 751, 747 A.2d 372 (1999) *Visco; Centralia.* Property owners alleging a *de facto* taking bear a heavy burden of proof. *Id.* They must show exceptional circumstances exist that substantially deprive them of the use of their property and that such deprivation is the direct and necessary consequence of the actions of the entity with eminent domain power. *Id.* Further, there is no bright line test to determine when a government action results in a *de facto* taking; each case turns on its own facts. *Id.*

We also recognize a *de facto* taking is not a physical seizure of property; it is an interference with one of the rights of ownership that substantially deprives the owner of the beneficial use of his property. *Visco; Adams Outdoor Adv., L.P. v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469 (Pa.Cmwlth.2006).

■ Here, Owner contends the trial court erred in dismissing his petition pursuant to the Court's holding in *Centralia.* As discussed above, in *Centralia* we upheld the trial court's dismissal of the borough's petition for viewers by applying the ripeness doctrine. *"Ripeness has been defined as the presence of an actual controversy; it requires a court to evaluate the fitness of the issues for judicial determination, as well as the hardship to the parties of withholding court consideration."* *Id.*, 658 A.2d at 842 (emphasis added). In *Centralia*, the borough's petition alleged the redevelopment authority's planned condemnation of all remaining residents' surface properties would ultimately result in the "destruction and elimination of [b]orough government and effective elimination of the [b]orough as an entity." *Id.* The borough's petition thus

alleged its rights to the subsurface mineral and coal reserves will ultimately escheat to the Commonwealth. Given the hypothetical nature of the borough's averments, we held the borough failed to state a cognizable claim for a *de facto* taking.

■ In the present case, Owner essentially contends the installation of the plastic drainage pipe in the ditch cut off vehicular access to the subject property from Virginia Avenue. This prohibits him from building homes along Virginia Avenue. To develop these lots, Owner would need to replace at least part of the plastic pipe with reinforced concrete pipe.

Owner testified he had the Virginia Avenue lots surveyed and intended to build homes on the other side of the pipe. N.T. at 49–50. However, he never spoke to an architect or developed plans for any type of building or structure. *Id.* at 50. Although he mentioned to Borough Council that he planned to develop these lots, he never presented any formal plans to the Borough Planning Commission. *Id.* at 51. Owner never filed a formal request for a hearing before the Borough Planning Commission. *Id.* at 52–53.

Owner further testified he never talked to anyone about any zoning permits he would need for developing the lots. *Id.* at 53. However, he knew he needed a dimensional variance. *Id.* In particular, Owner testified (with emphasis added):

> Well, after we had our lots surveyed, and set up on both Everson and Virginia, we went to [Borough Council] and we made our presentation to them to say this is what we'd like to do. *And this was after the pipe was installed.* We went to them in a very, very courteous way saying that you know, I would like to have—because we were short I think 10 feet on one piece of property and eight feet on another piece of prop-

erty. *What I said to the individuals there was that, okay, the pipe is there, the damage is done. I don't want you to compensate me for the pipe that's there, but in compensation I would like you to put in the three uprights to come up to the height of the land between Everson and Virginia, and backfill that in, and give me the variance for these other lots, and we were done.*

*Id.* at 54.

Owner further testified that in preparing his presentation to Borough Council, he did not do any investigation into dealing with water runoff. *Id.* at 55. Owner did not think they were at that stage. *Id.*

On redirect examination, Owner confirmed all of his dealings and complaints were with Borough Council and Borough Manager. *Id.* at 58. His dealings were not with the Planning Commission or Zoning Hearing Board. *Id.* In particular, Owner testified:

**Q.** *Your project hadn't gotten far enough along—*

**A.** *Exactly.*

**Q.** *—for anything to be done with the Planning Commission or the Zoning Hearing Board?*

**A.** *Exactly.*

**Q.** When you went to the planning— sorry, when you went to the Borough Council and their Manager, you were well aware that you had three lots that were short for purposes of construction on the zoning?

**A.** Right.

**Q.** *Those lots were each individually short, and that's why you were willing to make a deal with them concerning the no compensation if you were able to get a variance?*

**A.** *You're right,* but one lot was only short I think by maybe by one foot. *Id.* at 59.

Given these facts, we find no error or abuse of discretion in the trial court's decision to dismiss Owner's petition for viewers pursuant to our holding in *Centralia*. Owner's claim for a *de facto* taking is based on the premise that he cannot build homes on the three Virginia Avenue lots because the plastic pipe blocks vehicular access to the road. However:

1) The Borough never told Owner he cannot build homes on these lots;

2) Owner did not consult the Planning Commission or submit any concrete plans to the Borough;

3) Owner did not investigate what storm water improvements would be needed to build homes on these lots;

4) Owner did not explain why the current plastic PVC pipe cannot be replaced;

5) Owner did not explain why access is not possible from another road abutting his property;

6) Owner did not explain how he intended to resolve his need for variances for the three Virginia Avenue lots;

7) Owner did not explain why he waited so long to bring his claim or otherwise rebut an inference that his conduct evinced his realization that his claim for *de facto* taking lacked merit.

The facts here stand in stark contrast to the facts in other cases involving *de facto* taking claims by developers. For example, in *Lehigh Airport Authority I*, a development joint venture (developers), purchased and planned to develop a 632–acre tract into a large planned residential development (PRD) spanning three townships near the Lehigh Valley International Airport. Developers solicited investors for the project and spent nearly two million dollars to retain architectural, engineering

and design professionals to assist in planning the project. *See id.* Also, prior to formal condemnation of the entire tract by the airport authority, developers obtained zoning changes and PRD approvals from two of the three townships. Ultimately, this Court upheld the trial court's determination that a *de facto* taking occurred prior to the formal condemnation of the entire 632–acre tract. *Id.*

Conversely, in *Petition of 1301 Filbert Limited Partnership for Appointment of Viewers,* 64 Pa.Cmwlth. 605, 441 A.2d 1345 (1982), this Court affirmed the denial of a petition for viewers as "speculative and conjectural" where a hotel property would be substantially impaired by a four-year period of tunnel construction by the City in front of the hotel. In *Filbert,* this Court observed the construction work would adversely affect, but not preclude access to the hotel. We also noted owners knew or should have known of the prospective construction at time of purchase. The trial court rejected owners' expert testimony concerning the financial impact of the tunnel work as speculative and conjectural, and denied owners' *de facto* claim. We

agreed with the trial court's rationale and affirmed. "The case at bar is one in which the claim of de facto taking is not only prospective but is also speculative and conjectural. For such circumstances our law of eminent domain does not in its present posture, provide relief." *Id.* at 1360.

■ For the reasons set forth above, Owner's claims of injury and substantial deprivation of the use of his property are also speculative and conjectural. Therefore, the trial court properly rejected his *de facto* taking claim as premature and insufficient.[5] Therefore, we discern no error in the trial court's determination that Owner has not yet stated a claim for *de facto* taking. *Filbert; Centralia.* We affirm the trial court.[6]

### ORDER

**AND NOW,** this 18th day of July, 2011, the order of the Court of Common Pleas of Lackawanna County is **AFFIRMED.**

5. It is our interpretation of *Centralia,* and the trial court's order here, that the court dismissed Owner's petition for viewers without prejudice. We thus note Owner may re-file a claim for *de facto* taking if warranted by a change in facts.

6. Having determined Owner's claim for a *de facto* taking is not yet ripe for judicial resolution, we decline to address the Borough's arguments that it acquired a drainage easement by various means. Moreover, Owner's *de facto* claim alleged a taking of the entire subject property, not just the drainage ditch.

Absent findings of fact by the trial court, we also decline to address the Borough's argument that Owner's *de facto* taking claim is barred by the 21–year statute of limitations in *former* 42 Pa.C.S. § 5530(a)(3) (governing inverse condemnation proceedings under the 1964 Eminent Domain Code); Owner claims the taking occurred in the late 1980s or early 1990s when the Borough extended the pipe

onto his property. Conversely, the Borough contends Owner's cause of action accrued in the early to mid–1970s when the Borough began maintaining the drainage ditch.

However, we agree with the Borough that Owner's allegations that the Borough trespassed on his property, confiscated stockpiled fill, and later put in fence posts, do not support a claim for a *de facto* taking. Rather, they are tort claims. Because the Borough confiscated the fill in the mid–1990s, that claim is barred by the two-year statute of limitations applicable to taking and trespass claims. *See* 42 Pa.C.S. §§ 5524(4) and (7). We also note the Borough removed the fence posts from the subject property approximately one month after beginning its construction. In any event, more than two years passed since the 2006 incident with the fence posts. Therefore, Owner is precluded from filing a tort claim for the fence. *Id.*